Thomas Aloi, J.
The above-named defendant has brought a motion by way of an order to show cause why the defendant should not be permitted to inspect the Grand Jury minutes of the proceedings which resulted in his being indicted, on February 26, 1971, charged with a violation of section 195.05 of the Penal *386 Law, obstructing governmental administration. The charge was based on an incident which allegedly occurred at the Casa di Nappi restaurant and bar on the 23 and 24 of June, 1970, when the defendant was said intentionally to have obstructed, impaired and perverted the administration of law and prevented police officers who were working undercover for investigatory purposes, from completing their investigation by reason of his actions and words, which were alleged to have revealed their identities as police officers to others in a public place.
The court agreed after argument on the motion to read the Grand Jury minutes to determine whether or not there was, in fact, a prima facie case proved to the Grand Jury in order to support the indictment.
Stated in terms of the statute, the court must find, to sustain an indictment returned by a Grand Jury (Code Grim. Pro., § 251) that ‘1 all the evidence before them, taken together, is such as in their judgment would, if unexplained or uncontradicted, warrant a conviction by the trial jury. ’ ’
The New York State Penal Law at section 195.05 states the criteria which would establish the prima facie case of obstructing governmental administration: “ A person is guilty of obstructing governmental administration when he intentionally obstructs, impairs or perverts the administration of law or other governmental function or prevents or attempts to prevent a public servant from performing an official function, by means of intimidation, physical force or interference, or by means of any independently unlawful act. ’ ’
The gravamen of the charge is the obstruction, impairment and perversion of the administration of law and preventing tfie police officers from conducting an undercover investigation. The law further requires on the facts of this case that such actions must be “by means of * * * physical * * * interference, or * * * any independently unlawful act ”, as stated in the indictment. The indictment goes on to state that the defendant “ by the aforsaid [sic] means through his actions and words intentionally revealed and exposed their true identity as police officers to others in a public place when they, the police officers, were then and there lawfully concealing their true identity for lawful and necessary investigatory purposes, thereby rendering them ineffective as police investigators and unable to compítete their investigation.”
The Assistant District Attorney who presented the case examined every facet of the incident in an effort to get at the truth. The testimony before the Grand Jury covered a period of eight *387 days, and resulted in hundreds of pages of testimony, replete with witnesses contradicting each other and themselves. The following facts were established:
1. The defendant was present at the Casa di Nappi while undercover police agents were working on a narcotics investigation;
2. The defendant had some conversation with Mrs. Nappi, the operator of the Casa di Nappi;
3. The subject of the investigation, an alleged drug pusher, at some point became suspicious and left the Casa di Nappi;
4. Thereafter, according to the testimony, the defendant went up to the bar and stood between two girls, one of whom was the policewoman. The other girl was a person aiding her in the investigation.
The evidence is contradictory as to which spoke first, the defendant or the policewoman, but some conversation ensued which has been variously interpreted by those who heard it as having caused the undercover police officer to be recognized as such. It is the latter act which is apparently alleged to have been the “ physical interference ” by which the defendant intentionally obstructed, impaired and perverted the administration of law.
The uncontradicted testimony establishes the fact that the person to whom the identity was alleged to have been revealed (Mrs. Nappi) had previously reported a suspicion that drug activity was being carried on at her restaurant and bar and had requested police help.
A patron of the restaurant testified that the defendant on an occasion several days before the incident in question, had said to Mrs. Nappi: u You’re going to have to watch yourself, they’re really hitting this area, assuming the North Side, for prostitution and drugs.”
This statement was estimated by the witness to have been made “near ” the 12th of June, 12 days prior to the actual incident charged in the indictment.
Other witnesses stated that Mrs. Nappi had told them on the night of the incident that she thought the undercover policewoman was “ a cop woman ”; and another witness stated that Mrs. Nappi said to her “ be careful because the woman that was with Kelly was a policewoman. ’ ’ This apparently occurred prior to the arrival of the defendant, although the testimony is contradictory as to the time he actually entered the Casa di Nappi. Another witness testified that Mrs. Nappi had told bim the woman was a police officer.
*388 There is further evidence of conversation between Mrs. Nappi and the defendant, but nothing which furnishes the vital link which would establish that he was the one who informed her of the officer’s identity. There is, in fact, some testimony in the record!which would indicate there were other ways the suspect might have been alerted to the presence of the police.
The minutes indicate that a male police officer working as an undercover agent with the female police officer, was himself recognized in an incident totally removed from any involvement with the defendant. This officer testified that he himself pointed out the deputy police chief to the one who had recognized him. This person was one who had been arrested on a previous occasion by the undercover agent himself, and the testimony stated that this person questioned the officer as to whether or not he was working. Although he testified that he replied in the negative, there is nothing to indicate whether or not the other person believed him.
Evidence as to whether or not the policewoman was intoxicated or was only pretending to be; whether or not she indicated to the deputy chief that she needed help; or the effectiveness of the “ cover ” she chose to use on this case: that of a lesbian (which might have accounted for some of the hostility she reported on the part of the other customers in the bar) or any of a dozen additional points of information that were introduced into the testimony heard by the Grand Jury, are extraneous.
The testimony does definitely establish that for some reason the suspect under investigation did become suspicious. There is no evidence that directly connects the defendant with this. A tortuous route of circumstantial evidence must be followed to make the connection. And there are links missing in such a chain of circumstances.
To prove a fact by circumstantial evidence, there must be some evidence of some fact which, though true, does not itself answer the question in dispute but affords a reasonable supposition of its existence. The fact or facts upon which this supposition is to be based must be proved by word or object, and must not be left to rest in conjecture or suspicion.
Further, the hypothesis of guilt should flow naturally from the facts proved, and the evidence must exclude to a moral certainty every hypothesis but that of guilt. In other words, if circumstantial evidence be susceptible of two constructions, the one most favorable to the innocence of the accused must be adopted. (Richardson, Evidence, 9th ed., § 152.)
*389 The evidence before the Grand Jury cannot be considered conclusive in this regard. The very presence of the deputy chief of police might, of itself, make a wrongdoer .suspicious. There was, as before stated, at least one other possibility of identification which does not point in the direction of the defendant.
All witnesses are agreed that the confrontation between the policewoman and the defendant, irrespective of who spoke first, took place after the person who was the object of the investigation had left. All are agreed that subsequent to the confrontation there was a phone call, and that the girls were asked to come down to another restaurant, the Little Brown Jug, to meet the suspect and buy the drugs. The testimony further reveals that they met at the Little Brown Jug and spent considerable time together.
The testimony of the undercover policewoman before the Grand Jury is pertinent as to whether or not the ‘ ‘ cover ’ ’ had been revealed:
“A. After this happened Kelly and I left to meet Arthur down at the LB J. I figured that since Arthur called me there he didn’t know that I was a policewoman at the time and this is why I figured I still had a chance to get the marijuana from him and make my case.
“ Q. Now, you left. What did you do and where did you go after you left?
“A. We left and I then drove to the LBJ, went in there and Arthur (the suspect) and ‘ E ’ was sitting in a booth. We went and joined them. They were still friendly towards us and I asked them why, you know, they didn’t come back to the Casa di Nappi and Arthur said, you know, well, you know, something was funny around there, didn’t you know something was funny around there, everybody was looking at us; and I said oh, well, maybe there was something funny, I don’t know.
“ Q. Then what happened?
“A. We went back with Arthur and, you know, so I asked him where the marijuana was and he said he couldn’t get it but for us to meet him that evening and he probably would have it for me. We then left.”
This would seem conclusively to refute the contention that the suspect knew the undercover agent to be a policewoman when he left the Casa di Nappi.
It has been argued that a case is made out for obstructing governmental administration when a defendant “ intentionally obstructs, impairs or perverts the administration of law or other governmental function.”
*390 However the sources which interpret this section of the Penal Law, although admittedly scarce, hold that more must be proven.
Bishop v. Golden (302 F. Supp. 502, 506 [E. D. N. Y.]), says: “ The statute against obstructing governmental administration requires as an element of the crime that the accused act by one of three methods: (1) ‘ intimidation (2) ‘ physical force or interference ’, or (3) ‘ any independently unlawful act.’ ”
McKinney’s Practice Commentary to section 195.05, the section being interpreted, states: ‘1 The requirement that the conduct which constitutes an obstruction of governmental function be one of violence or physical interference or be independently unlawful is necessary in order to prevent the section from being an overly broad catchall.”
Dowsey’s “ Charges to the Jury”, states, under the section “ Obstructing Governmental Administration (vol. 2, p. 17-27 et seq.): ‘ Let us examine the elements of this crime, separately. There must be an act of intimidation, physical force or interference, or by means of any independently unlawful-act. * * * There must be ah intent on the part of the person accused to obstruct or impair or pervert the administration of law or other governmental function. If no intent on the part of the defendant is proven by the People beyond a reasonable doubt or no intent can be inferred from the conduct of the defendant the prosecution must fail.’”
If there were uncontroverted evidence that the defendant intentionally revealed the identity of an undercover police agent to one under investigation (or to any other person with the intent that the suspect be warned) and such identification were made by words and acts, then we agree a prima facie case might be made out for the crime charged here. However, we do not believe that a verbal act alone constitutes physical force or interference within the accepted meaning of these words. However, assuming for the sake of argument that verbal acts comply with the provisions of section 195.05 of the Penal Law, nevertheless we feel that the Grand Jury minutes do not establish such verbal act, intentionally spoken, clearly and unequivocally resulting in the identification of the undercover policewoman to the person under investigation.
Nor are we able to find, on all the evidence before the Grand Jury, any independently unlawful act.
Black’s Law Dictionary defines an unlawful act as one “ contrary to law, and presupposes that there must be an existing law.”
*391 Such “ unlawful act ” would seem to be, from the Grand Jury testimony, the breaking of a police department regulation which strictly forbade any police officer from speaking to a member of the organized crime division in public. The defendant was reprimanded by his superior officer for so doing, and received departmental discipline. However, it has long been settled law that departmental trials or proceedings for the discipline of police officers are not a punishment for crime. (See 1 N. Y. Jur., Administrative Law, § 114.)
Because of the uniqueness of the case, the court has perhaps probed more deeply than is necessary to the making of the decision on the motion. In fact, there are two distinct stories recorded in the minutes of the Grand Jury. We do not here determine which of these stories is true. It is sufficient to find that neither makes out a case which would, if unexplained or uncontradicted, warrant a trial jury in convicting the defendant of the crime charged.
There is no proof anywhere in the minutes of the Grand Jury to indicate that the defendant performed any intentional act which would have revealed or exposed the undercover agent, nor do we find any intimidation, physical force or interference with the performing of official function, or any independently unlawful act.
Summarizing the evidence before the Grand Jury, notwithstanding the presumption that an indictment returned by the Grand Jury is based on legal and sufficient evidence, it is the finding of this court that the indictment must be dismissed for failure to prove a prima facie case.
The motion to dismiss the indictment must be granted.